Filed 9/14/22  In re Hunter N. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re HUNTER N. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078222 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J290766, J290767 & J290768) |
| v. | OPINION |
| N.I., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Susan Lawrence, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

1

This juvenile dependency case concerns three children: Hunter (age 9 when the petition was filed), Scott (age 13), and Daniel (age 16). The juvenile court sustained jurisdictional allegations under Welfare and Institutions Code section 300, subdivision (b), as to all three children and under subdivisions (g) and (j) as to Hunter and Scott. (Unlabeled statutory references are to this code.) N.I. (Mother) appeals from the dispositional findings and orders. She challenges only the court's finding that she had a current substance abuse problem that placed the children at risk of harm and the dispositional order requiring her to participate in substance abuse testing and treatment. We find Mother's challenge justiciable but meritless, and we therefore affirm.

BACKGROUND

San Bernardino County Children and Family Services (CFS) received two referrals on the same date concerning the three children. The first reported that Mother brought Hunter and Scott to California from Arizona, where they had been living, and left them to stay with their maternal stepgrandmother (Grandmother) without providing the children's medical insurance and other information needed to obtain services for them. This was of particular concern because Hunter had been diagnosed with Asperger's syndrome, attention deficit hyperactivity disorder (ADHD), and possible bipolar disorder. He also had significant behavioral problems including tantrums and a recent "meltdown" during which he choked himself, banged his head, and put a hole in the wall. Hunter's behavioral issues had previously required law enforcement intervention and hospitalization. He had been seeing a therapist, attending a special school through which

2

he received services, and taking medication, but the medication caused side effects and would change frequently as his treatment providers tried to find the right dose or medication. Hunter and Scott's father, C.N., who had a history of domestic violence with Mother and physical abuse of Daniel, had no involvement with the family for several years, and Mother had a restraining order in place against him. Daniel, the eldest, had spent the summer in California with his father, A.R., and arrangements had been made for him to stay with Grandmother and attend high school until December. Hunter and Scott had not attended school for five weeks. This, too, was of particular concern for Hunter, because of his special needs and the services he had been receiving through his school in Arizona before Mother removed him. The children had not seen a doctor or dentist in several years.

Mother had brought the two younger boys to stay with Grandmother for two weeks, saying that she needed to return to Arizona that night for work and that she had been experiencing mental health issues and needed help with the children while she went into a mental health treatment facility. Mother later sent Grandmother messages denying that she had said she was going to a mental institution. Mother did not return to pick up the boys as planned and did not respond to Grandmother's attempts to reach her. Grandmother reported that Mother has untreated mental health issues and a history of drug use, including methamphetamine. Some years earlier, the children were present when Mother's boyfriend or fiancé shot and killed himself in the home. Grandmother

expressed concern for the children's safety with Mother and reported that Hunter and Scott were afraid of Mother and wanted to stay in Grandmother's care.

The second referral stated that the family was the subject of three general neglect investigations by the child welfare agency in Arizona but could not be located. The family's home in Arizona was empty and appeared to be for sale. The children reportedly had a history of physical abuse and had possibly witnessed Mother's ex-boyfriend shoot and kill himself in the home roughly a year earlier. It was reported that Mother may have a history of substance abuse, and Mother's mental health provider reported to the Arizona social worker that she had been diagnosed with bipolar disorder that was not being treated or medicated.

When interviewed, Hunter denied physical discipline in Mother's home, reported that Mother drinks wine and smokes a "'colorful thing with a metal box'" containing liquid, and added that Mother had a history of fighting with maternal great-aunt (Aunt P.), including having physical fights in his presence. Hunter recalled the suicide in the home but said he was asleep, did not hear the shot, and was woken up afterward by police officers. He reported feeling safe with both Mother and Grandmother but preferred to live with Grandmother.

Scott reported that Mother drank alcohol but not often. He said she gets "'really angry'" and "'really mad,'" yelled at him and his siblings a lot, calls them bad names and threatens to hit them, spanks them with her hand and threatens to hit them with a spatula, has difficulty working with others, and has a history of arguments with others. Scott

4

reported feeling unsafe when Mother got really mad at him. He felt safer with Grandmother than with Mother and preferred to stay in California with Grandmother. Scott also said that Hunter was safer with Grandmother and that he does not think Mother can take care of Hunter by herself.

Aunt P. reported that the children had been placed in her care during a previous dependency proceeding, and she expressed concern for their safety in Mother's care. She reported that Mother uses "weed" and prescription pills, engages in risky behavior, and abuses the children mentally and physically.

Daniel reported that he came to live in California because he was "'too stressed out'" living with Mother and his brothers because Mother gave him too many responsibilities. She required him to help around the home and watch his brothers in addition to going to school, completing his homework, and earning money from work, half of which Mother would take for household expenses. In addition to his own schoolwork and job, Daniel was responsible for waking up himself and his brothers, getting them all ready for school, walking to the bus stop or walking to school, picking up around the house, doing the dishes, sweeping, mopping, helping his brothers with their homework, sometimes cooking dinner for the family, and cleaning their rooms—all while Mother slept or did "'her own thing.'" Daniel said that the children were "on their own" when it came to schoolwork and that Scott and Hunter had a lot of missing homework. Hunter's behavior also "stressed [Daniel] out." The social worker was concerned that Daniel, at age 16, "was shouldering a significant amount of responsibilities" and "did a

lot of the caretaking in the home." Daniel's father, who did not communicate with or have a relationship with Mother apart from arranging Daniel's visits, was also shocked at the extent to which Daniel was responsible for the care of his younger brothers and Mother's household.

Daniel also reported the children had been placed in foster care years earlier because Mother's ex-husband, C.N., the father of Hunter and Scott, was physically and emotionally abusive to Mother and was "'rough'" with Daniel. He reported that approximately two years earlier his "stepfather" in Arizona committed suicide by shooting himself while Mother and the three boys were present in the home. Daniel denied that mother drank or used other drugs, but he reported that she might smoke marijuana, and he observed her using a vape pen. He also reported that Mother uses too much of her prescription medication, running out before the fill date, and that when she runs out of medication, she acts mean, raises her voice, and has heightened anxiety. Daniel was concerned that since he had left Arizona, the responsibility of caring for his half brothers fell to Mother, who was not in a "'good mental spot,'" was overwhelmed, was struggling financially, and had been in a constant decline since the stepfather's suicide. He said that Mother mostly sleeps all day, leaves the children at home unattended, did not put the children in school this year, and was definitely avoiding law enforcement and children and family services. He did not know if Hunter and Scott were safe with Mother and was worried they were not eating properly since he left. Since leaving Arizona, Daniel said he has realized that Mother needs help.

6

Daniel, Scott, and Grandmother all reported that Mother discussed having "visions" and unusual thoughts and saying random, strange things, such as that she was president of the United States or that her dead mother was communicating to her through other people. Scott reported that Mother believed his dead grandmother had told her to get a dog and that she suddenly "had unusual concerns about the school system" in Arizona and consequently took Scott and Hunter out of school that same day.

Mother did not respond to multiple attempts to reach her by the social worker and law enforcement. She eventually returned to get the children and was arrested for child abandonment and neglect. Daniel was detained from Mother and released to the custody of his father, A.R., who was found to be nonoffending and is not a party to this appeal. Scott and Hunter were placed with Grandmother after being detained from Mother and their father, C.N., who did not participate in the juvenile court and is not a party to this appeal. At the detention hearing, the juvenile court ordered drug testing for Mother, explaining that because the court had not yet taken jurisdiction, testing would be voluntary. Mother took one test, which was positive for amphetamines and marijuana, and declined to participate in further testing.

Petitions were filed alleging all three children were persons described by section 300. At mediation, CFS agreed (1) to dismiss an allegation that Mother knew or should have known that the children were residing with a sex offender, (2) to withdraw its recommendation that she complete a domestic violence program, and (3) to modify the mental health allegation to state that Mother has a mental health diagnosis that if left

7

untreated places the children at risk. Mother agreed to submit on the allegations regarding mental health and her history of domestic violence and that the children were subject to a previous open dependency proceeding in Los Angeles County, but Mother reserved the right to contest the substance abuse allegation and the recommendation that she participate in substance abuse treatment and testing.

At the jurisdiction hearing, Mother did not contest any of the allegations concerning C.N., the father of Hunter and Scott. After executing a waiver and agreeing to submit the petition on the basis of the reports and other documents, Mother contested the substance abuse allegation. She argued that she has a valid medical marijuana license in Arizona and used a vape pen with cannabis oil for pain, anxiety, and sleep, but she does not use it near the children. She argued that she takes Adderall as prescribed for ADHD and that her positive drug test results for cannabis and amphetamines were due to those medications and not to substance abuse.

The juvenile court rejected Mother's arguments and found true the allegation that Mother has an untreated substance abuse problem. The court also found true the allegations concerning Mother's history of domestic violence, the previous open dependency case, and the modified allegation concerning Mother's mental illness. As to Hunter and Scott only, the court sustained the additional allegations that their father had a history of domestic violence, untreated mental health problems, a previous open dependency case, and a history of physically abusing Daniel, and the court also found

that their father's whereabouts were unknown, leaving Hunter and Scott without provisions for care and support.

As to Daniel, the court removed him from Mother's custody, placed him with his father A.R., and terminated jurisdiction with a juvenile custody order granting both parents joint legal custody, physical custody and primary residence with A.R. The court removed Hunter and Scott from their parents' custody, placed them in the care of CFS, and ordered family reunification services for Mother, including individual therapy, parenting education, a psychological evaluation and medication consultation including coordination so that all prescribers are aware of all of Mother's medications, and outpatient drug treatment and testing.

DISCUSSION

Mother raises two issues on appeal. First, she contends that the true finding on the substance abuse allegation is not supported by substantial evidence. Second, Mother asserts that the court abused its discretion by ordering that her case plan include an outpatient substance abuse treatment program and random drug testing.

A. *Justiciability*

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged

9

statutory grounds for jurisdiction are supported by the evidence. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 (*Alexis E.*).)

Mother challenges only one of the four jurisdictional allegations sustained as to her, and she does not challenge any of the allegations sustained as to C.N. Accordingly, any decision we might render on Mother's appeal will not result in a reversal of the juvenile court's finding that it had dependency jurisdiction over the three children.

"An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status." (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490.) Consequently, we ordinarily "may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence" or is unchallenged on appeal. (*Id.* at p. 1492.) However, we will reach the merits of a challenge to any jurisdictional finding that serves as the basis for dispositional orders that are also challenged on appeal. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763 (*Drake M.*); *In re L.O.* (2021) 67 Cal.App.5th 227, 237-238.)

Here, because the sustained substance abuse allegation is also the basis for the dispositional orders that Mother challenges on appeal, we address the merits of Mother's substantial evidence challenge.

B. *Substance Abuse Allegation*

Mother argues there was insufficient evidence to support the allegation that she was a current substance abuser. We disagree.

10

Section 300, subdivision (b), provides that a child is within the juvenile court's jurisdiction if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse." The burden is on the agency to demonstrate the following three elements by a preponderance of the evidence: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdictional hearing, the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.) The court may consider past events in deciding whether a child currently needs the court's protection. (*Ibid.*) A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) A parent's refusal to acknowledge past substance abuse and its potential harmful effects on the parent's judgment and on the children give the court a clear basis to infer that past substance abuse will continue in the absence of court supervision. (*In re A.F.* (2016) 3 Cal.App.5th 283, 293.)

11

A parent's drug use alone cannot support juvenile court jurisdiction. (*Drake M.*, *supra*, 211 Cal.App.4th at pp. 764-765.) Jurisdiction must instead be based on a parent's substance abuse that results in a risk of serious physical harm to the child. (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.)

A challenge to the sufficiency of the evidence supporting jurisdictional and dispositional findings and orders requires us to determine if substantial evidence, contradicted or not, supports them. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) In making that determination, we draw all reasonable inferences from the evidence to support the juvenile court's findings and orders and review the record in the light most favorable to the court's determinations. (*Ibid.*) We do not reweigh the evidence or exercise independent judgment but merely determine if the evidence is sufficient to support the juvenile court's findings. (*Ibid.*)

Contrary to Mother's argument, we find substantial evidence in the record supports the juvenile court's finding. First, as the court noted, Mother has a documented history of substance abuse, including a criminal history related to drugs and alcohol and previous substantiated dependency referrals relating to her abuse of various drugs. Grandmother reported that Mother had a history of using methamphetamine. Aunt P. reported Mother uses "weed" and prescription pills, and in the prior dependency proceeding Aunt P. also reported that Mother had used methamphetamine in the past and had been arrested for possession of methamphetamine. Mother concedes she was

12

previously addicted to opioid pain medications. Mother admitted she currently uses a vape pen with cannabis oil.

Mother appears to argue that because she has a valid authorization to use marijuana for medical reasons, the juvenile court should not have relied, in part, on her marijuana use as a basis for sustaining the substance abuse allegation. We are not persuaded. First, even if Mother's use of marijuana is lawful, it can still support dependency jurisdiction if it subjects the children to substantial risk of physical harm, just as otherwise lawful use of alcohol can support dependency jurisdiction if it puts the children at risk. (*Alexis E.*, *supra*, 171 Cal.App.4th at p. 452 ["even legal use of marijuana can be abuse if it presents a risk of harm to minors"].) Second, the document Mother provided does not state that it is a medical marijuana authorization. It also does not identify the condition for which Mother is being treated. Third, Mother's previous medical marijuana authorization (which expired in 2012) likewise did not identify the condition for which Mother was being treated, and it expressly cautioned against using medical marijuana "with alcohol or other mind altering medication(s)." By her own admission, Mother is now using marijuana with multiple psychotropic medications, but the record contains no evidence that any physician is monitoring Mother's marijuana use, how it might interact with her numerous prescription medications, or the extent to which her cannabis use might contribute to or exacerbate her mental health conditions, which Mother acknowledged include ADHD, anxiety, posttraumatic stress disorder, and mood regulation issues in addition to the report from her mental health provider in Arizona that

13

she has untreated bipolar disorder. For all of these reasons, the document that Mother claims is a currently valid medical marijuana license does not persuade us that the juvenile court erred by relying, in part, on Mother's marijuana use as a basis for sustaining the substance abuse allegation.

In any event, the evidence of Mother's current abuse of prescription medications also supports the juvenile court's finding. Daniel reported that Mother regularly took more of her medications than directed and ran out before the refill dates. Mother submitted pharmacy records indicating she takes several medications that are scheduled controlled substances due to their potential for abuse, including Adderall (amphetamine-dextroamphetamine mixed salts), Vyvanse (lisdexamfetamine), Ultram (tramadol, an opioid), and Ambien (zolpidem tartrate). Daniel's report that Mother used more medication than prescribed is especially troubling given that pharmacy records show that she filled prescriptions for Adderall that appear to exceed double the maximum recommended daily dosage for treating ADHD. (See Adderall® CII label, revised January 2022, Reference ID: 4943718, available at <https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/011522s044lbl.pdf> [as of September 13, 2022] ["Only in rare cases will it be necessary to exceed a total of 40 mg per day."].) The records also show several different prescribers issuing prescriptions at various intervals, with Mother at times filling prescriptions for Adderall and Vyvanse, both of which contain amphetamines, during the same period. In light of Mother's admitted history of abusing prescription medications and the evidence of Mother's recent

14

prescriptions, the juvenile court could reasonably infer that Mother was continuing to abuse prescription medications.

Substantial evidence also supports the court's finding of risk. "Indeed, the evidence suggests one of the most salient manifestations of parental substance abuse is present here—[the parent's] drug use has resulted in '"a failure to fulfill major role obligations at . . . home (e.g., . . . neglect of children or household)."' [Citation.]" (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 185 (*Natalie A.*).) The evidence showed that Mother was unemployed, had not worked in several years, and took half of Daniel's earnings to meet household expenses. At home, Mother slept all day, essentially leaving the children to their own devices and relying on Daniel to take care of his brothers and maintain the household. It was Daniel's responsibility to wake himself up, wake up his brothers, and get everyone ready for school while Mother slept. Only if Hunter were being difficult did Mother occasionally wake up and help. After school, Daniel would have to pick up around the house, wash the dishes, sweep, mop, help his brothers with their homework, clean their rooms, and sometimes cook dinner for himself and his brothers while Mother would either be sleeping or "'doing her own thing.'" Mother was so dependent on Daniel to take care of his brothers that after he left Arizona, Daniel was concerned that Mother would be unable to meet their most basic needs such as ensuring they were eating properly. Mother also left the children at home with no supervision. The children had not been to a dentist or doctor in two to three years or longer. Based on the evidence, the juvenile court could reasonably have inferred a nexus between Mother's

drug use and her failure to ensure the children were properly cared for and supervised. (*Natalie A.*, at p. 185.)

Under similar facts, the court in *In re K.B.* (2021) 59 Cal.App.5th 593 (*K.B.*) rejected the mother's argument that there was insufficient evidence that her use of methamphetamine and marijuana placed her children at substantial risk of physical harm. There, the children reported that their mother got so sleepy that she "routinely disappeared from her children's lives at about 5:00 p.m. until they woke her the next morning for school." (*Id.* at pp. 600-601.) "Contrary to the mother's argument, sufficient evidence shows she created a serious risk of physical harm to her children. She left them unsupervised most of the time they were home. Children are immature, inquisitive, clever about escaping, and inexperienced with life's hazards. With impulsive urges and without much judgment about what could go wrong, children need supervision. A speeding car, a fire, a fall, a predator: disasters can strike swiftly and without warning." (*Id.* at p. 602.) The same applies here, only more so: Mother slept all day and stayed up all night, routinely left the children home alone, failed to respond when the children's school in Arizona needed to reach her, and failed to respond to multiple contacts from both law enforcement and the child welfare agencies in both Arizona and California. The pattern of neglect continued after she brought the children to Grandmother's home for a planned two-week stay. One month later, Mother had not communicated with Grandmother or the children, Mother did not respond to

Grandmother's messages, and she neglected to provide Grandmother with the information and documents needed to obtain necessary services for the children.

Mother's substantial evidence argument takes a divide-and-conquer approach, addressing each of the substances in isolation. She argues that her past addiction was only to prescription painkillers and had been overcome, as evidenced by her completion of a drug treatment program ordered in the prior dependency proceeding. She further argues that her current use of medicinal marijuana for pain was a safer alternative to prescription opioids and that there was no evidence she was currently abusing the marijuana or amphetamines prescribed for ADHD. Similarly, she argues that all of her behaviors impacting her care of the children had not been proved to be the result of substance abuse rather than mental illness.

Mother cites no authority requiring us to view each substance in isolation from one another or from her acknowledged mental health issues. On the contrary, we must review "'''''*the whole record* in the light most favorable to the judgment below to determine whether it discloses substantial evidence.'''''" (*I.J.*, *supra*, 56 Cal.4th at p. 773, italics added.) Mother has a history of substance abuse. During the pendency of this case, she tested positive for marijuana and amphetamine. She claims to have a medical marijuana license, but the document she provided does not say that it is a medical marijuana license or identify the condition for which she is being treated. There is no evidence that any medical care provider is monitoring her marijuana use for interaction with her numerous prescription medications or her mental health conditions.

17

Her prescription history supports a reasonable inference that she is abusing prescription medications, and Daniel's statements confirm that she uses her medications in excess of the prescribed dosage. Mother has abdicated nearly all of her responsibilities as a parent, including routine medical and dental care. She also refused to participate in further drug testing and evaded law enforcement and child welfare agencies in two states. Taken as a whole, the evidence supports a reasonable inference that Mother's abuse of multiple substances is ongoing and puts her children at substantial risk of physical harm. (See *K.B.*, *supra*, 59 Cal.App.5th at p. 605; *In re Lana S.* (2012) 207 Cal.App.4th 94, 106.)

Citing *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824 and *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219, Mother argues that courts generally find a substantial risk of physical harm to the children from a parent's substance abuse only when either the children are of tender years—that is, six years of age or younger—or there is an identified, specific hazard in the children's environment, and neither scenario applies here. The same argument was rejected in *K.B.*, which involved children of similar ages to the children in this case, because there is no need for the tender-age presumption of a risk of physical harm if there is "[d]irect evidence of lack of supervision," as there is here. (*K.B.*, *supra*, 59 Cal.App.5th at p. 603.) Mother's argument also fails to acknowledge that, like a child of tender years, Hunter requires more intense supervision and is at greater risk of harm from an inattentive parent because of his special needs and significant behavioral problems. (See *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1138 [risk to child is even greater for child with "special needs"],

18

overruled on other grounds as stated in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1007 [substance abuse would prevent father from caring for special needs infant]; Seiser & Kumli, California Juvenile Courts Practice and Procedure (2022) § 2.126[2][a] [recognizing that "the child's special needs, if any" are a relevant factor in a juvenile court's decision to remove a child from a parent with substance abuse problems].)  Given Hunter's sometimes violent tantrums, which had required law enforcement intervention and hospitalization and had already left a hole in Grandmother's wall, there can be little doubt that the other two children were also placed at risk of physical harm by Mother's failure to supervise them.  In addition, because Hunter had been attending a special school and receiving services through the school, Mother's sudden decision to remove him from school and keep him out for five weeks, as well as Mother's failure to provide Grandmother with the necessary documentation for Hunter to receive services in California, also placed him at serious risk of physical harm. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1125.)

In sum, there is ample evidence supporting the juvenile court's true finding that Mother's substance abuse placed the children at substantial risk of serious physical harm.

C.  *Dispositional Orders for Drug Testing and Treatment*

Mother contends that the juvenile court abused its discretion when it ordered her to participate in substance abuse testing and treatment.  We disagree.

A juvenile court has the power to make "any reasonable orders" to the parent of a dependent child, including participation in programs "designed to eliminate those

19

conditions that led to the court's finding" of jurisdiction. (§ 362, subd. (d).) "The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.) "'"The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason."'" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Because we affirm the juvenile court's jurisdictional finding, this related challenge fails. The juvenile court's finding that Mother has a current substance abuse problem is supported by substantial evidence, so its decision to impose a requirement that she participate in drug testing and a substance abuse treatment program was not an abuse of discretion. Those programs are clearly directed toward eliminating one of the conditions leading to the court's finding of jurisdiction—Mother's drug abuse. Additionally, Mother's evasion and denial regarding her drug problem supports a conclusion that court-supervised treatment and monitoring will be necessary for Mother's sustained recovery. (See *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

Mother argues, however, that her use of medicinal marijuana is legal and necessary for pain management and so that she can avoid the opioid painkillers to which she was formerly addicted. She also claims that her use of Adderall under a physician's

20

care is necessary to stabilize her mental health, and the juvenile court's orders will require her to "forgo her prescribed medications" and threaten to sabotage her efforts at reunification.

We disagree for two reasons. First, a similar argument was rejected in *Alexis E.*, in which the father claimed that the juvenile court's orders would force him to choose between his lawful and necessary use of medical marijuana and reunifying with his children. (*Alexis E.*, *supra*, 171 Cal.App.4th at pp. 453-454.) The court in *Alexis E.* rejected the notion that father would necessarily have to forgo his use of medical marijuana in order to proceed with reunification. Rather, drug counseling was appropriate because the father needed to restrict the manner in which he had been using marijuana in order not to put his children at risk of harm, and drug testing was appropriate to monitor the amount of marijuana he was using. (*Id*. at p. 454.) We agree with the *Alexis E.* court and decline to presume that Mother will have to stop using any medications that are medically necessary. As in *Alexis E.*, substance abuse counseling and testing are warranted given Mother's long history of abusing multiple drugs and the impact Mother's substance abuse has had on her parenting.

Second, although the juvenile court did mention one time that Mother "has not tested clean," and Mother emphasizes that remark in order to argue that she will be required to "test clean" and thereby give up prescription medications essential for her mental health, nothing in the juvenile court's orders contains any such requirement. To the contrary, the juvenile court expressly ordered a medical consultation and coordination

21

so that all of Mother's prescribers would be aware of all of her prescription medications, indicating that the juvenile court had no intention of depriving Mother of any medically necessary medications. As CFS acknowledges, if Mother's prescription medications are properly coordinated, documented, and monitored, any positive test result consistent with appropriate use of prescribed medication would not be a violation. Rather, the testing is a mechanism to ensure that Mother is using only prescribed medications and using them only as prescribed.

For all of these reasons, we reject Mother's argument that the juvenile court's orders for drug testing and treatment will interfere with her mental health treatment and obstruct reunification. We find no abuse of discretion in the juvenile court's dispositional orders.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:


MILLER
Acting P. J.


SLOUGH
J.

22